UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

IN RE:      CHRISTOPHER M. GRUBB and                 Case No. 07-30253-KRH
            SHARON M. GRUBB,                          Chapter 13

                    Debtors.

## AMENDED MEMORANDUM OPINION

Before the Court is the Initial Application for Allowance of Compensation of the Boleman Law Firm (the "Firm") pursuant to 11 U.S.C. § 330(a) and § 503(b)(2), Rule 2016 of the Federal Rules of Bankruptcy Procedure, and Standing Order 08-1 (the "Application") seeking approval of attorneys fees in this Chapter 13 case in the amount of $5,569. As part of the plan confirmation process, the Firm was awarded and has already been paid from the bankruptcy estate a "no-look" fee of $3,000. The present Application includes all of the time that was part of the "no-look" fee. By way of the present Application, the firm seeks an additional, supplemental award of $2,569 in fees. In addition to the present request, the Firm was awarded separately and has already been paid supplemental fees of $700 in connection with the sale of the Debtors' real estate. The Application does not include any of the time that was part of that supplemental fee award. The Firm has been paid fees of $3,700 to date from the bankruptcy estate, and it now seeks an additional award of $2,569. For the reasons set forth in this opinion, the Court will deny the Firm's Application.

An evidentiary hearing was conducted on the Application on September 30, 2009 (the "Hearing"). The Firm filed a Post Trial Memorandum in Support of its Initial Fee Application on October 23, 2009 (the "Post Trial Memorandum"). This Memorandum Opinion sets forth the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of

Bankruptcy Procedure.[1]   The Court has subject-matter jurisdiction of this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (B).  Venue is appropriate in this Court pursuant to 28 U.S.C. § 1409.

Christopher and Sharon Grubb (the Debtors") filed this bankruptcy case under Chapter 13 of the Bankruptcy Code on January 27, 2007 (the "Petition Date").   The Debtors' Amended/Modified Chapter 13 plan was confirmed by order entered June 8, 2009.[2]  The plan calls for the Debtors to pay the sum of $28,640.08 to the Chapter 13 trustee in monthly installments of $342.86 for the first 28 months followed by monthly installments of $595 for the next 32 months.  The case was, and it remains very much, a routine Chapter 13 case.  The Debtors, as of the date of the Application, had paid the sum of $11,090.08 to the Trustee.  The plan provides for a dividend of 2% for the Debtors' non-priority unsecured creditors.  No payment has yet been made to any of the Debtors' non-priority unsecured creditors.[3]

---

[1]  Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  *See* Fed. R. Bankr. P. 7052.

[2]  The Debtors' original plan filed on January 25, 2007, could not be confirmed due to a tax claim filed by the Internal Revenue Service (the "IRS").  An amended /modified plan which addressed the tax claim was filed on June 25, 2007, and that plan was confirmed by order entered August 22, 2007.  A second amended /modified plan was filed on January 2, 2009, and confirmed by order entered April 9, 2009.  The current plan replaced the Debtors' previous plan dated January 2, 2009.

[3]  Debtors' counsel point out in their Post Trial Memorandum that Court approval of their supplemental fee request will not dilute the anticipated 2% distribution to the Debtors' non-priority unsecured creditors because the Trustee presently projects, based upon the proofs of claim that have been filed in the case, that the distribution will actually turn out to be in the 4% range.  Thus the award of the requested supplemental fees can be paid out of the unanticipated 2% "windfall" that the unsecured creditors are now going to receive.  Debtors' counsel ignore the fact that, as any award of supplemental fees would be paid ahead of the unsecured creditors, the award will delay the payment to the unsecured creditors who ultimately bear the risk that the Debtors may not actually complete their plan payments.

### Applicable Law

While there is no provision made for the payment of Debtors' counsel in Chapter 7 (liquidation) or Chapter 11 (reorganization) cases,[4] § 330(a)(4)(B) of the Bankruptcy Code contains a specific provision for compensation of debtors' attorneys in Chapter 13 cases. That section provides:

> In a . . . chapter 13 case in which the debtor is an individual, the court may allow reasonable compensation to the debtor's attorney for representing the interests of the debtor in connection with the bankruptcy case based on a consideration of the benefit and necessity of such services to the debtor and the other factors set forth in this section.

Attorney fees in Chapter 13 cases are payable from the estate under § 330(a)(4)(B) and are expenses of administration under § 503(b)(2). *See In re Hall*, 296 B.R. 707, 709-10 (Bankr. E.D. Va. 2002); *see also In re Oliver*, 222 B.R. 272, 274 (Bankr. E.D. Va. 1998) ("Reading sections 1326(a)(2), 503(b)(2) and 330(a)(4)(B) together, we conclude that the debtor's attorney's fees and expenses are administrative expenses which are properly payable . . . pursuant to section 1326(a)(2).").

An entity seeking an award of compensation from the bankruptcy estate (regardless of chapter), must file a formal fee application under Rule 2016(a) of the Federal Rules of Bankruptcy Procedure setting forth "a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested." Fed. R. Bankr. P. 2016(a). To this extent, counsel must file an application that contains sufficient documentation regarding the amount of time spent and the type of work performed. *See In re Howell*, 226 B.R. 279, 281 (Bankr. M.D. Fla.1998) (citing *Am. Benefit Life Ins. Co. v. Baddock (In re First Colonial Corp.*

---

[4]   An award of attorney fees from the bankruptcy estate is not allowable to a debtor's attorney in a Chapter 7 bankruptcy case. *See Lamie v. United States,* 540 U.S. 526, 534-39 (2004). The Code does provide for the employment and compensation of counsel for a debtor in possession (the "DIP") in a Chapter 11 case, but there the DIP performs the role of a bankruptcy trustee and is a fiduciary for the estate.

3

*of Am.)*, 544 F.2d 1291, 1299 (5th Cir. 1977)).    Normally, compensation is awarded by the lodestar method, where the award is calculated by multiplying a reasonable number of hours expended by a reasonable hourly rate.  *See Pennsylvania v. Delaware Valley Citizens' Counsel for Clean Air*, 478 U.S. 546, 563-565 (1986); *In re Harris*, Case No. 96-36765, 1998 WL 408896, at *3 (Bankr. E.D. Va. Apr.14, 1998).    An exception to this rule generally applies for attorneys in Chapter 13 consumer bankruptcy cases.[5]  As most Chapter 13 cases are largely form driven and follow a predictable routine, many courts have adopted simplified procedures for approving fees in Chapter 13 cases where the fees do not exceed a specified amount.  *See Harman v. Levin*, 772 F.2d 1150, 1153 (4th Cir.1985) ("Chapter 13 bankruptcy cases often involve a number of relatively routine questions with which regular practitioners quickly become familiar, so they represent the type of cases where a court may well utilize factors in addition to the time reasonably expended and a reasonable hourly rate.").  Most districts around the country have implemented simplified procedures in Chapter 13 cases aimed at standardizing and streamlining compensation for normal and routine Chapter 13 legal services where no detailed fee application is required.  As one noted Treatise observes "[i]t is almost inconceivable that bankruptcy courts would engage in full-scale lodestar calculation of debtors' attorneys' fees in every Chapter 13 case, especially in districts with high-volume Chapter 13 programs."  Lundin, *supra* note 5, § 294-25 & 26.  The Eastern District of Virginia has a high incidence of Chapter 13 filings.

---

[5]  It has been suggested that the lodestar approach breaks down in high volume Chapter 13 practices because the best Chapter 13 debtors' attorneys operate computerized offices with specialized paralegals who manage a large volume of Chapter 13 cases very efficiently.  "Three or four hours of attorney time and a like number of hours of paralegal time in an experienced debtors' attorney's office can produce excellent results in a 'typical' Chapter 13 case."  4 Keith M. Lundin, *Chapter 13 Bankruptcy*, § 294-22 & 23 (3d ed. 2000 & supp. 2004).

Consistent therewith, this district has adopted Standing Order 08-1 (the "Standing Order"), which provides that attorneys representing debtors filing Chapter 13 petitions may claim a "no look" fee in the amount of $3,000 and expenses of $300. The Standing Order requires that this "no look" fee cover all "services that would reasonably be expected in order to obtain confirmation of a plan. . . ." *See* Standing Order. If the requested fees do not exceed $3000, then the plan coupled with the disclosure of compensation that the attorney is required to file under Rule 2016(b) of the Federal Rules of Bankruptcy Procedure are treated as a fee application, and the order confirming the plan is treated as also approving the fee. *See In re Robinson,* 368 B.R. 492, 498-99 (Bankr. E.D. Va. 2007). The Standing Order also provides a menu of supplemental fees to accommodate services that counsel may be required to render in addition to those routinely provided to obtain plan confirmation.

The Standing Order was adopted to provide uniformity in the consideration of compensation for debtors' counsel in Chapter 13 cases. The Guidelines for Fee Applications in Chapter 13 Cases Filed on and after October 17, 2005 (the "Guidelines"), attached to and incorporated into the Standing Order, specify the format and procedures for submission of fee applications by attorneys representing debtors in a Chapter 13 case. The policies and standards set forth in the Guidelines provide a just, speedy, and inexpensive procedure for approving the award of attorney fees in Chapter 13 cases and ensure that any such award of compensation is fair and reasonable. The judges of the court recognized the importance for counsel to be fairly compensated for shepherding clients through the Chapter 13 bankruptcy process. It was anticipated that the fee increase from $1,500 to $3,000 and the new menu for supplemental fees combined with the simplified procedures set forth in the Standing Order would accomplish this

goal.[6]  While it was accepted from a time and billing standpoint that the fees earned in theses cases would very well exceed the value of the time actually expended, it was understood that the fees might sometimes be less than the time actually devoted to a particular case.  In the long run, given the high volume of cases handled, counsel would be fairly compensated, and the issue of having to award attorney fees in each of these high volume cases would be addressed though a standard, streamlined procedure.  *Cf. Harman v. Levin*, 772 F.2d 1150, 1153 (4th Cir.1985).  At the same time, it was anticipated that the Standing Order would reduce the time that judges would be required to spend on reviewing supplemental fee applications.  *See In re Hall,* Case No. 07-32071-DOT (September 29, 2009).

This Application comes on the heels of eight prior applications (the "Prior Applications"), all filed by the same firm, that the Court has had occasion recently to consider.[7] This Application, like the eight Prior Applications, seeks an award of compensation at considerable variance with the normal "no look" fee and the menu for supplemental fees established for Chapter 13 cases by the Standing Order.  While compliance with the procedural requirements of the Standing Order is mandatory, counsel is free to apply, as the Application does in this case, for a fee at variance with the policy.  *See In re Hall,* Case No. 07-32071-DOT

---

[6]  As Chief Judge Tice recently observed, "[i]n adopting Standing Order 08-1 and increasing the no look fee from $1,500.00 (for cases filed prior to October 17, 2005) to $3,000.00, the judges of the court were aware of debtors' counsel's increased obligations to their clients in Chapter 13 cases, post-BAPCPA." *In re Hall,* Case No. 07-32071-DOT (September 29, 2009).  The data at the time that the "no look" fee was increased indicated that the median fee for Chapter 13 cases nationwide was approximately $1,500.  *See Chapter 13 Attorneys Fees & Function Survey,* Nat'l Assoc. of Consumer Bankruptcy Attorneys (Mar. 2003).

[7]  Those cases are *In re Stephen Gary Shubick*, Case No. 07-31396-KRH; *In re Robert Gene Franklin & Diane Barton Franklin*, Case No. 07-31675-KRH; *In re James Harold Baugus & Rebecca Bess Baugus*, Case No. 07-32107-KRH; *In re Alma Campbell Gates*, Case No. 07-31179-KRH; *In re Wyatt Neal Brooks & Kathryn Annette Brooks*, 07-31783-KRH; *In re Sondra Kaye Tart*, Case No. 08-30114-KRH; *In re Clifton Lee Pulliam*, Case No. 08-32603-KRH; *In re Sean Ramel Rushin & Stephanie Renee Rushin*, Case No. 08-36494-KRH.  Each of the applications in those eight cases presented identical issues to the present application.  The firm scheduled the evidentiary hearing in this case largely to address the concerns the Court had raised with the prior applications.

(September 29, 2009).[8]  "If the attorney knows from the inception of the case that unusual issues are present, the attorney may contract with the client for a higher fee, but in that event must submit a formal fee application.  Additionally, if the need arises in the course of the case for services that were not reasonably anticipated when the "no-look" fee was requested and approved, the attorney may file an application for additional compensation.  Interim Proc. 2016-1(C)(8)."  *In re Robinson*, 368 B.R. 492, 499 (Bankr. E.D. Va. 2007).  It was recognized that significant litigation could occur in connection with a case that might require the rendition of legal services outside the normal routine.  Disputes may arise over the validity or extent of liens on encumbered assets, over the ownership or disposition of assets, over claimed exemptions, over plan provisions and over a host of other issues.  In all such instances the "no look" fee becomes inapplicable and a formal fee application must be filed in its stead that details the contemporaneous time entries of counsel throughout the case along with an itemization and appropriate documentation of expenses for which counsel seek reimbursement.  The fee application must comport with the guidelines promulgated by the Office of the United States Trustee.[9]  Those guidelines are set forth at 28 C.F.R. Part 58, Appendix A.

Supplemental fee applications for such variances were not intended to be a means for expanding the amount of the "no look" fee requested and paid at the outset of an otherwise routine Chapter 13 case.  That practice would circumvent the procedures and efficiencies

---

[8]  Paragraph 1 of the Guidelines attached to the Standing Order provides:  "Compliance by applicants with the procedural requirements is mandatory, but applicants are free to apply for a fee at variance with the policy statements provided the application clearly identifies any such variance."

[9]  The Bankruptcy Reform Act of 1994 directed the Office of the United States Trustee to promulgate procedural guidelines to be applied uniformly in reviewing applications for compensation and reimbursement of expenses under § 330.  28 U.S.C. § 586(a)(3)(A)(ii).  Those procedures require, in relevant part:  "Time entries should be kept contemporaneously with the services rendered in time periods of tenths of an hour."  28 C.F.R. Part 58, Appendix A, paragraph (b)(4)(v).  The same standard was adopted by the Court in Standing Order 08-1, exhibit 1, para. 2.c.

adopted by the Standing Order and would subvert its purpose.[10]  Supplemental fee applications

for such variances are intended to address unusual and unexpected circumstances.

The applicant bears the burden of proof as to the reasonableness of requested

compensation.  *See, e.g., In re Computer Learning Ctrs.*, 272 B.R. 897, 908 (Bankr. E.D.Va.

2001); *In re Great Sweats, Inc.*, 113 B.R. 240, 241 (Bankr. E.D. Va. 1990); *In re Maxine's Inc.*,

304 B.R. 245, 249 (Bankr. D. Md. 2003); *In re Reed*, 95 B.R. 626, 628 (Bankr. E.D. Ark.1988);

*In re Pettibone Corp.*, 74 B.R. 293, 299 (Bankr. N.D. Ill.1987); *In re Werth*, 32 B.R. 442, 444

(Bankr. D. Colo. 1983).  The burden of proof to justify a fee allowance is on the movant.  *See In*

*re Harman Supermarket, Inc.*, 44 B.R. 918, 920 (Bankr. W.D. Va. 1984).  The Bankruptcy Code

provides that counsel in a Chapter 13 case may be compensated from the estate "for representing

the interests of the debtor" in a bankruptcy case based on "the benefit and necessity of such

services to the debtor as well the other factors set forth [in § 330 of the Bankruptcy Code]."  11

U.S.C § 330(a)(4)(B).  The "other factors" the Court must consider are:

> the nature, the extent, and the value of such services, *taking into account all relevant factors*, including-
>
> (A) the time spent on such services;
>
> (B) the rates charged for such services;
>
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

---

[10]   Counsel is by no means restricted to the "no-look" fee.  The procedure is simply intended to simplify the application process for the large majority of cases in which the "no-look" amount will provide reasonable compensation.  However, once Counsel apply for the "no-look" fee, supplemental fees beyond that previously approved by the court can only be requested where the services rendered were not anticipated at the outset.

(E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

The Fourth Circuit has utilized a "hybrid of the lodestar and 12-factor tests" in evaluating fee requests. *See In re Hall,* Case No. 07-32071-DOT (September 29, 2009); *see also EEOC v. Serv. News Co.*, 898 F.2d 958, 965-66 (4th Cir. 1990); *In re Great Sweats, Inc.*, 113 B.R. 240, 241 (Bankr. E.D.Va.1990) (citing *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 n. 28 (4th Cir.1978)).[11]    The standards for awarding attorney fees under § 330 of the Bankruptcy Code were rewritten by the Bankruptcy reform Act of 1994, Pub. L. No. 103-394 (the "Bankruptcy Reform Act").  It has been suggested that Congress intended to substitute its own 6 factor test in the place of the Fourth Circuit's 12 factor test when it adopted the amendments to § 330 of the Bankruptcy Code in the Bankruptcy Reform Act.  *See In re Robinson,* 368 B.R. 492, 498 (Bankr. E.D. Va. 2007).  While that analysis is sound, the language in § 330(a)(3) that instructs the court to "tak[e] into account all relevant factors" would appear broad enough to encompass the 12

---

[11]  The 12 factors to be considered in evaluating the reasonableness of attorney's fees are:
   (1) the time and labor expended;
   (2) the novelty and difficulty of the question raised;
   (3) the skill required to properly perform the legal services rendered;
   (4) the attorney's opportunity costs in pressing the instant litigation;
   (5) the customary fee for like work;
   (6) the attorney's expectations at the outset of the litigation;
   (7) the time limitations imposed by the client or circumstances;
   (8) the amount in controversy and the results obtained;
   (9) the experience, reputation and ability of the attorney;
   (10) the undesirability of the case within the legal community in which the suit arose;
   (11) the nature and length of the professional relationship between attorney and client; and
   (12) attorney's fees awards in similar cases.
*Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 (4th Cir.1978) (adopting the Fifth Circuit's decision in *Johnson v. Georgia Highway Express*, 488 F.2d 714, 717-19 (5th Cir.1974)).

factors previously articulated by the Fourth Circuit Court of Appeals in *Barber*. The 12 factors are not inconsistent with the provisions set forth in the Bankruptcy Code. What is clear is that the 1994 amendments to § 330 reflect the intent of Congress for courts to vigorously regulate the award of attorney fees in bankruptcy cases.

The case law bears this out. The Court has an independent duty to investigate the reasonableness of compensation. *See In re Reed*, 95 B.R. at 628; *In re Pettibone Corp.*, 74 B.R. at 299-300. This is true even when no objection to the fee request has been filed. *See id.* The Court has a heightened responsibility in reviewing and awarding fees in Chapter 13 cases. *See In re Courtois*, 222 B.R. 491, 494 (Bankr. D. Md. 1998) ("Such duty to independently review professional fee applications in Chapter 13 cases becomes a particularly important supervisory function of the court when 'neither the debtors nor most creditors have an incentive to object to attorney's fees.'"). There is no committee, as would be the case in a Chapter 11 case, to critique and otherwise counterbalance the fee requests. The fee request is not advanced on the part of an estate fiduciary, but rather on behalf of a party in interest. As the fees in a Chapter 13 case are paid from moneys the Debtor is already committed by the plan to pay to the Trustee, the Debtor has no financial incentive to object. Creditors individually are similarly disincentivized from filing an objection as the cost of doing so will likely exceed any recovery they might possibly receive from the estate.[12] It is left to the Court to police the system.[13]

---

[12] For instance, in this case the expected dividend to unsecured creditors is only 2 percent.

[13] The Firm argues in its Post Trial Memorandum that the Court should not pay close scrutiny to its Application.

> "Reviewing attorney time records is a thankless task that bankruptcy judges have frequently remarked is among their least favorite aspects of their jobs. This Court's frustration with the task has been apparent at the recent hearings, and the Court made mention of the hours spent reviewing the instant fee application. But one court suggested the painstaking review of each individual time entry in a fee application, as this Court has apparently done with recent Boleman applications, may not actually result in the finding of a reasonable fee:

**The Firm's Billing Practice**

At the Hearing, the Firm presented evidence about its billing practices generally and about the services rendered in this case specifically as described in the Application.  Mark C. Leffler ("Mr. Leffler"), the chief counsel of the Firm, testified about the Firm's normal procedure for handling Chapter 13 cases.  Responsibility for each client's bankruptcy case is divided among teams of the Firm's attorneys and administrators.  Each lawyer and administrator team handles a separate component of the Chapter 13 process.  Applying an assembly line approach to the practice of law, one team of attorneys and administrators is responsible for intake, another is responsible for 341 meetings, another deals with motions for relief, still another handles motions to dismiss, etc.  Mr. Leffler testified that in his view this approach saved money because each

---

[T]he billing and fee review process are more art than science.  The Court is not required to, nor realistically could it, determine an exact or a perfectly precise fee for each case.  The Court's charge is to set a reasonable fee.

For this Court, that fee review and allowance process is a holistic one. It involves, on one level, looking at the big picture of a case.  What were the results obtained?  What were the problems encountered?  What expertise did counsel bring to the case?  Was the rate charged for the services within the legal community norms?  And, was the engagement completed in a timely, efficient manner under the circumstances?  [ ].

To just dwell on the offending tasks or services distorts the reality of the case.  It may result in a mechanical, "cookie-cutter" approach, making it an incomplete review process.  Such process becomes one of going through the time records, culling out those entries that offend any of the recognized fee standards, and reducing the total fee by some amount for each alleged billing infraction.  Such a narrowly-focused analysis results in a "nit-picking" exercise that may actually impede the process of determining a reasonable fee, since it tends to push the big picture factors into the background or eliminate them entirely.  Such focus may also tend to exert an inordinate, downward pressure on fees in general, regardless of individual case circumstances and unwittingly foster the bargain basement type of pricing structure that *Ingersoll* cautioned against.

*In re McNally*, 2006 WL 2348687, at *3 (Bankr. D.Colo. 2006).  In this case, counsel submits that, although a few of the individual time entries may be questionable, the overall amount of time expended in this case was reasonable and demonstrates efficiency in light of the nature of the case."  Post Trial Memorandum at 4-5.

For the reasons set forth herein, it is obvious that acceptance of this premise would be detrimental to the bankruptcy estate.  The Court cannot simply abrogate its responsibility to review fee applications, as the Firm suggests it should.

employee is given an assigned role on a particular team.  Given the Firm's high volume

consumer bankruptcy practice,[14] staffing cases in this manner, Mr. Leffler explained, allows one

team of attorneys and administrators to represent multiple clients simultaneously in various

aspects of the proceedings.

The Firm utilizes a software program known as Abicus as its primary client database.

The program is also used to capture and record attorney time records.  Each particular task

performed by a billing unit[15] is recorded contemporaneously and then the actual time is rounded

up to the next tenth of an hour because "that is what it is required to be billed at."[16]  The detailed

time entries are later compiled into the Application and separated by project categories in

accordance with the U.S. Trustee's guidelines.

### Concerns of the Court

At the Hearing, the Court raised three primary concerns that it had with the Application:

first, the duplication of effort and the systemic inefficiency incident to the high number of billing

units assigned to the file; second, the routine billing of secretarial and ministerial time as

paraprofessional time; and third, the overstatement of time resulting from the Firm's "tenth of an

hour/upward rounding" practice for billing time and the Firm's "micro-component billing event

methodology" for capturing time spent on a task.  These concerns had been raised previously by

---

[14]  Mr. Leffler testified that the firm has over 5700 Chapter 13 cases presently pending before the Court.  Transcript
of Hearing at 23:11-12.

[15]  A billing unit is defined as any timekeeper (whether lawyer or paraprofessional) in the billing system who billed
time to this file.  Mr. Leffler testified that 10 lawyers and 19 administrators (for a total of 29 billing units) recorded
time on this file.  Transcript of Hearing at 18:6-15.

[16]  The Firm labors under the mistaken impression that the U.S. Trustee Guidelines and this Court's Standing Order
require it to record each distinct task that the Firm performs on behalf of a client contemporaneously and then to
round the time spent on the distinct task up to a tenth of an hour, regardless of the actual time it took to perform the
task.

the Court in connection with its consideration of the Firm's Prior Applications.   The Firm
scheduled the evidentiary Hearing on this Application in order to address the Court's concerns.

<u>The Number of Billing Units</u>

The first concern of the Court involved the number of billing units that had been assigned
to the file.   Twenty-nine different people billed time to the file.   The Court expressed concern
that this practice necessarily created systemic inefficiency and duplication of effort.   The Court
observed that all 29 people assigned to the case could not help but to bill time to the file.   The
Firm's Post Trial Memorandum addressed this concern directly.    The Firm argued (in
contradiction to Mr. Leffler's testimony)[17] that its time records reflected "very little" duplicative
services and that the services that were duplicative were at least partially accounted for in the
Firm's reduction in its fee request.   But the Court's concern runs deeper than this response would
suggest.   Take for example the two amendments that were made to schedule F.   Nine different
people billed time to this project category, none of whom appear to have been involved with the
preparation of the original schedule.   If there had been more consistency in the representation,
perhaps the need to file two amendments to the same schedule could have been avoided.
Certainly, the services of nine professionals were not required to add four creditors to an
amended schedule.

The systemic concern is more troubling.   With 29 different billing units assigned to this
file, it is hard to imagine how the efficiencies that Judge Lundin lamented were the cause for the
lodestar approach to break down in high volume Chapter 13 practices could ever be achieved.
*See supra* note 5.   The Firm's billing system appears designed to produce the opposite result.   It
is one thing for the Firm to choose to represent its clients in this assembly line fashion devoting

---

[17]   See, for example, Mr. Leffler's testimony at pages 47 and 48 of the hearing transcript where he identifies four
time entries on August 24, 2007, July 29, 2008, September 24, 2008 and September 26, 2008 as duplicative.

20 to 30 people to a routine case;[18] it is entirely another for the Court to reward the systemic inefficiency it creates by awarding compensation on this basis.  It appears that the lodestar approach breaks down for high volume Chapter 13 practices at both ends of the staffing continuum.

<u>Billing of Secretarial and Ministerial Time as Paraprofessional Time</u>

The second area of concern raised by the Court involved the billing of secretarial and ministerial time as paraprofessional time.  The Guidelines clearly state that "[t]he Court will not approve charges for time expended for work that is secretarial or administrative in nature."  *See also In re C & J Oil Co., Inc.*, 81 B.R. 398, 404 (Bankr. W.D. Va. 1987) ("Clerical or routine services are not compensable from bankruptcy estate as necessary legal services.").  Mr. Leffler admitted that many of the time entries included in the Application fell into this category.  As a result, Mr. Leffler orally moved during the Hearing to amend the Firm's Application by reducing the amount of the fees requested by $302.  The Post Trial Memorandum does not address this category of concern except to explain that the Firm is under the mistaken belief that it is required to include "what some may deem non-billable services in the time records" by the Court's Standing Order.  Post Trial Memorandum at 5.[19]  Nothing in the Standing Order requires the inclusion of non-billable time in a fee application.  To the contrary, "[attorneys] should make a good faith effort to exclude from a fee request hours that are excessive, redundant or otherwise

---

[18]  The Court has no issue with the quality of the legal services the Firm provides.  The Court agrees in this regard with the observation of Chief Judge Tice in *In re Hall,* Case No. 07-32071-DOT (September 29, 2009), where he stated "I am mindful of the very capable services the firm renders to its clients as well as to the court."

[19]  The Standing Order states,  "Initial fee applications for amounts in excess of $3,000.00, and all supplemental fee applications, must be supported by detailed, contemporaneous time and expense records from the beginning of the case showing, for each discrete activity, the date, time expended, identity of the attorney or paralegal providing the service, and amount requested."  Guidelines, para. 2.a.

unnecessary." *Hensley v. Eckerhart*, 461 U.S. 423, 434 (1983).  Indeed, a lawyer is ethically obligated to exclude such hours from a fee submission.  *See id.*

Mr. Leffler testified about the time entries annexed to the Application in painstaking detail.  Mr. Leffler conceded that a number of the entries represented ministerial functions that were not billable.[20]  For example, the first time entry "teleconference with consult to remind of appointment in office" is not compensable.  While this may be an important and salutary function, no law degree was necessary to perform the task.  It is entirely ministerial in nature and must be included in office overhead.  Mr. Leffler agreed.[21]  He identified 9 other entries on the first page (page 1 of 10) of the detailed time submission attached to the Application that were secretarial or ministerial in nature and not billable.  Based upon Mr. Leffler's testimony, the Court finds that 24% of the hours detailed on the first page must be disallowed.  Mr. Leffler testified that 11 of the 21 time entries listed on the second page (page 2 of 10) were for non-billable time.  Based upon Mr. Leffler's testimony, the Court finds that more than half of the hours detailed on the second page must be disallowed.  Similarly, based on Mr. Leffler's testimony, the Court finds that 9 of the time entries on page 3, 12 of the time entries on page 4, and 13 of the time entries on page 5 were for non-billable time.  Based upon his testimony, the Court finds that 48% of the time entries noted on these five pages are not allowable.  All of the time entries on these first five pages of the Application fall within the first project billing category where a total of 19.5 hours are recorded for a requested fee of $3,440.  When the non-

---

[20] Mr. Leffler testified:  "Generally speaking, when I see a time record that . . . says 'left message' or 'reviewed a message' . . . I don't see that as a very substantive step and so it would fall into that ministerial category."  Hearing Transcript at 37:17-21.  He also testified:  "this is another thing . . . that I think is kind of a indication of ministerial work or possible duplicative, when you see something that describes forwarding, receiving. . . ."  Hearing Transcript at 38:8-11.  Later he testified:  "any time I see a note that just says 'left message' or 'reviewed message' or 'forward document' I think that should be presumed to be ministerial and there are some of those. . . ."  Hearing Transcript at 46:13-16.

[21] Mr. Leffler testified:  "It seems as though it was simply . . . a reminder call . . . like you get from the dentist office when you have an appointment.  So I would call that absolutely secretarial."  Hearing Transcript at 24:21-24.

billable time is backed out, only $1,961.50 of the time remaining is compensable.  The same problem is endemic throughout the other five project categories.

<u>Method of Capturing and Reporting Billable Time</u>

The third, and perhaps the most troubling, concern raised by the Court involved the manner in which time was being captured and recorded by the Firm.  The Firm labors under the mistaken impression that, because it is required to break down time entries into tenths of an hour on its fee application, it is entitled to record a tenth of an hour for each task that it performs even where that task may take substantially less time than a tenth of an hour for it to complete. Nothing can be further from the truth.  The lodestar method for determining fee requests depends upon the accurate reporting of attorney time.   As counsel point out in their Post Trial Memorandum, "courts must rely on the integrity and reputation of attorneys.  That trust must not be misplaced."  *In re Hutter Construction Company*, 126 B.R. 1005, 1021 (Bankr. E.D. Wis. 1991).

Here, however, *each discrete activity,*[22] no matter how small, is captured as a billable event and then recorded in a one-tenth of an hour increment regardless of the time actually spent in performing the task.  Given the Firm's high volume practice,[23] billable time in the aggregate is being significantly over stated.[24]  As the Court explained at the Hearing, if it takes a person four

---

[22]  The Firm quotes this language from the Guidelines attached to the Standing Order

[23]  The Firm has over 5700 cases currently pending before the court. *See supra* note 14.

[24]  Mr. Leffler testified: "Yesterday, we had -- here in Richmond, we had 36 Chapter 13 341 meetings . . . with Carl Bates' office.  They took place on -- at 9 o'clock, 10 o'clock, 11, 12 and 2 o'clock.  Five different hours of the day. We had 36 clients.  We had one administrator and one lawyer here for the entire docket all the way through the day. . . . [W]e basically have five hours of lawyer time and five hours of administrator time that's billed between 36 clients.  That averages out to about eight minutes for the lawyer and eight minutes for the administrator per client, rounded to the nearest tenth, it's a .2 billable hours for lawyer and .2 for administrator, for each client."  Hearing Transcript at 19-20.  Thus, 5 hours of attorney time and 5 hours of administrator time are captured and recorded as 7.2 hours of attorney time and 7.2 hours of administrator time.  Ten hours of actual time (assuming it is appropriate to bill for more than one person to attend the hearing) becomes 14.4 hours of billable time.  This is excessive.

hours to read a 200 page book, the time entry should be four hours.  It is simply improper to break the task of reading the book into *each discrete activity* and record a tenth of an hour for each page read.  That would turn 4 hours of actual time into 20 hours of billable time.  That is not how the system is intended to work.  Despite the Firm's contentions to the contrary, the time entries must necessarily be constrained to the actual number of hours worked.

Yet the Firm argues in its Post Trial Memorandum that it should be entitled to "round up" and, in effect, bill for time it did not expend.  The Firm points to the billing guidelines promulgated by the Office of the U.S. Trustee that state "[t]ime entries should be kept contemporaneously with the services rendered in time periods of tenths of an hour."  28 C.F.R. Part 58, App. A, para. (b)(4)(v).[25]  "Surely," the firm argues, "both the Office of the U.S. Trustee and this Court understood, in adopting the respective fee application guidelines and rules, the standard across the legal services industry is to round time up to the nearest tenth of an hour and, further, that the effect of such practice inside and outside bankruptcy practice is that time billed is greater than actual time spent performing the service."  Post Trial Memorandum at 7.  The Court understands no such thing, and it rejects the premise that the practice employed by the Firm is the standard employed throughout the legal services industry.  Under the lodestar method for calculating fee awards, counsel may not bill for time they do not expend.

The Firm denies that its time records are broken up into micro-components so that *each discrete activity* is recorded to take advantage of their "tenth of an hour/upward rounding" billing practice.  Rather, the Firm argues that its time records reflect *each discrete activity* encapsulated and reasonably billed as a single unit of time.  Post Trial Memorandum at 7.  However the Firm's practice for capturing billable events might be described, the detailed time records would reflect

---

[25]  The Firm argues that this same standard was adopted by the Court in Standing Order 08-1, Exhibit 1, para. 2.c. But the Guidelines state that time should be shown to the nearest tenth of an hour.  Not rounded up to the next tenth of an hour, as is the Firm's practice.

that its time records are broken up into micro-components.  Several examples can be gleaned from but a single page of the detailed billing statement attached to the Application.  On page 5 of 10 for instance, two separate time entries for the same timekeeper appear for January 27, 2009. The first notes:  "Telephone call to client regarding vehicle.  Left message."  The second notes: "Receive and review voice mail from client."  Each item records a time entry of .1 hours.  Thus .2 hours of time has been captured and recorded by breaking a single task, "communication with client," into its micro-components.  This is not an isolated occurrence.  The pattern repeats on the same page with two similar entries on March 4, 2009, followed by two entries on June 12, 2009. The Court found similar entries detailed throughout the Application.

Consistent with the findings of the Court at the Hearing, the Firm admits in its Post Trial Memorandum that it will routinely bill one tenth of an hour of time to a client, "even if a client matter is called by the clerk and not heard by the Court, as is the frequent practice in this Court." "It is fair," the Firm argues, "to bill each client for representing him or her in the Court."  Post Trial Memorandum at 7.  And, while this may be true, what is not fair is to represent (as the Firm admits it has done) a large number of clients in connection with a single hearing that may last less than an hour and then break the representation down into micro-components and charge each client one tenth of an hour.  Such a practice, like recording the time to read the pages from a book instead of the time to read the entire book, badly inflates the actual time expended on each matter.  Some "discreet activities" may need to be combined with others so that the total time expended adds up to a tenth of an hour.  The Firm's time recordation practices render all of its time entries suspect.  This is the reason that the Court suggested at the Hearing that it may need to appoint a fee examiner.[26]   Given the Court's findings, the Court cannot simply apply the

---

[26]  Given the Firm's billing practices, the Court reserves the right to appoint a fee examiner in connection with any subsequent formal fee application that it may be required to consider.

"hybrid of the lodestar and 12-factor tests" in evaluating the Firm's fee Application. In the absence of accurate, reliable time entries, the Court must make its own determination of the reasonableness of the hours devoted to this case. *See Boleman Law Firm, P.C. v. U.S. Trustee,* 355 B.R. 548 (E. D. Va. 2006)*; In re Great Sweats, Inc.*, 113 B.R. at 242.

### Analysis of the Application

The Application at bar sets forth six projects undertaken in this case for which the Firm seeks compensation. The first project category is for case management. Legal services provided within this category include such routine matters as obtaining an understanding of the client's financial circumstances, preparing and filing the necessary bankruptcy forms including the Debtors' plan, communications with the Debtors throughout the process, attendance at the § 341 meeting of creditors, appearance (if necessary) at the confirmation hearing, and filing the necessary certifications to obtain the Debtors' discharge. In this case there was an initial objection to confirmation. One of the Debtors was self-employed and had failed to file a tax return for a prior year. This objection was not unanticipated. The original plan had estimated the amount of the claim of the IRS. Counsel dealt with the objection by having the Debtors file the missing tax return and by filing a modified plan that accurately provided for the claim of the IRS. The modified plan subsequently was confirmed. The fees requested for this project category total $3,340.

In reviewing Mr. Leffler's testimony concerning the non-billable secretarial and administrative time entries that were included in this project category, the Court determined that only $1,961.50 of the fees requested were compensable. *See supra* pp. 14-16. A further downward departure from the fee request might very well be in order if the Court were to scrutinize the remaining compensable billing entries in this category in light of the firm's "tenth

of an hour/upward rounding" practice for billing time and the Firm's "micro-component billing event methodology" for capturing time.  But the Court finds in considering the nature, the extent, and the value of the services provided in this project category that a fee of $1,961.50 is not unreasonable given the results obtained for the benefit of the Debtors.

Next the Firm seeks fees totaling $340.50 for handling three motions for relief from stay. Two of these motions pertained to the same property – the Debtor's home (the "Property").  Two deeds of trust, both held by the same lender, encumbered the Property.  The Lender was represented by a single law firm.  The two motions for relief from stay were identical.  The Debtors did not contest the motions.  Counsel for the Debtors filed no responsive pleadings. They consented to the relief sought.  Counsel for the Debtors endorsed two identical consent orders by which the Debtors surrendered their interest in the Property.  The form of the consent order used by the Lender was its routine consent order – a form order identical to hundreds that Debtors' counsel had reviewed previously.  No hearing was required.  The third motion for relief from stay pertained to the surrender of the Debtors' motor vehicle and was handled in a similar fashion.

The fees the Firm seeks in this second project category for handling these three motions for relief from stay are problematic.  Setting aside the Court's issues with the Firm's billing of secretarial time as paraprofessional time, the Firm's "tenth of an hour/upward rounding" practice for billing time and the Firm's "micro-component billing event methodology" for capturing time, the Court has difficulty finding significant value to the endorsement of consent orders surrendering collateral.  The Court's analysis would be different had the Firm negotiated a consent order that provided some benefit for the Debtors, such as allowing them to remain in their home or to keep their car.  That is not to say that endorsement of the consent orders was not

in the best interest of the Debtors.  But the orders provided little benefit for the Debtors.  The Court finds it hard to ascribe $340 worth of value here.  Furthermore, the Court has already awarded $700 in supplemental fees to the Firm in connection with the Firm's assistance of the Debtors in the sale of the Property.  No time records were produced in regard to that transaction.[27]  The Court believes that, as an integrated real estate transaction, the sale of the Property must have included necessarily orders to lift the stay.  Given the nature, the extent, and the value of the services provided in this project category and given the Court's own determination of the amount of time reasonably necessary to endorse the consent orders, the Court finds that a fee of $150 is appropriate for handling the lift stay motions.

The third project category pertains to a motion to dismiss filed by the Chapter 13 trustee for a payment default.  The fees requested for this category total $176.  The payment default required counsel to communicate with the Debtors so that they could cure the default (by making the missed payment) and to provide evidence of that payment to the Chapter 13 trustee.  While the Firm suggests it is entitled to fees for representing the Debtors at multiple hearings on this matter, the issue was resolved by having the Debtor cure the default.  No intervention by the Court was required.  The trustee withdrew the motion.  No hearing was required.  Given the Firm's "tenth of an hour/upward rounding" practice for billing time and the Firm's "micro-component billing event methodology" for capturing time, the Court is skeptical that the Firm expended $176 in actual time on this matter.  However, based upon the nature, extent and value

---

[27]  The Court acknowledges that the Firm omitted the time expended in connection with the Motion to Sell because of counsel's belief that doing so was in keeping with the Court's prior ruling from a hearing conducted on June 17, 2009, in connection with an Application for Compensation in the case of *Alma Gates*, Case No. 07-31179-KRH.  To the extent that the ruling on the fee application in the case of *Alma Gates* had any precedential effect, the Court will no longer follow that precedent in light of the difficulties the Court has encountered in this and the Prior Applications.  The Court will require all prior time records to be provided with any formal fee application.

of the services provided to the Debtors, the Court finds that a fee of $150 is appropriate for this project category.

The fourth project category deals with two post-confirmation modifications that were made to the Debtors' plan.  The first modification was necessitated by a claim filed by the IRS for a post-petition tax liability under 11 U.S.C. § 1305.  The claim created a plan underfunding problem.  Debtors' counsel were able to correct the problem by filing a second modified plan. The next post-petition modification resulted from the Debtors' decision to surrender their motor vehicle and from the amendment of the claim filed by the IRS.  Again the issues were resolved by filing a modified plan.  The plan confirmed in each instance was the Court's uniform plan. No hearing on either of the post-petition modifications was required.  The fees requested for this project category total $1,036.50.

Again, issues with billing of secretarial time as paraprofessional time and issues with the Firm's "tenth of an hour/upward rounding" practice for billing time and the Firm's "micro-component billing event methodology" for capturing time are involved.  The issues that were raised that necessitated the plan modifications were resolved consensually.  There was no negotiation or litigation of issues.  The matters were resolved by filing amendments to the plan that acceded to the creditor's demands.  Again, the Court does not suggest that this result was not in the best interest of the Debtors – it appears it was – but the Court finds it hard to believe that the two amendments required the expenditure of $1,036.50 in time.  Based upon the Court's own determination of the reasonableness of the amount of time the Firm should have expended on this matter and based upon the nature, extent and value of the services the Debtors received, the Court will award $500 for this project category.

22

The fifth project category concerns amendments made to the Debtors' schedule F. The Debtors advised counsel that they had inadvertently omitted certain prepetition liabilities from their original schedules. This was remedied by preparing and filing an amended schedule. The fees requested for this project category total $931.50. To put this fee request in perspective, the majority of Chapter 7 practitioners charge less than $900 to handle an entire Chapter 7 case.[28] Amending a single schedule is not rocket science. It is something a paraprofessional should have been able to handle. The two amendments resulted in the addition of a total of four creditors. Yet, the services of nine professionals were required to accomplish this very simple task. The Court finds this expenditure of time to be unreasonable. The Court will award $150 for this project category.

The last project category is for legal services rendered in the preparation of the fee Application. Total fees requested here are $644.50. Under the circumstances, the Court finds this fee request to be unwarranted. First, the Application did not assist the Court in its determination of the reasonableness of the fees requested. The Application included large blocks of non-billable secretarial time and non-billable duplicative time. While the Firm maintains that the duplicative time was addressed in its voluntary reduction of fees requested, that was nowhere explained in the Application. The Firm even made an oral motion at the Hearing for a further reduction in its fee request based upon the Court's questioning. The Court was required to review an Application that requested compensation for a substantial portion of time that was, on reflection, not compensable. Furthermore, the manner of recording time in this case has been drawn into serious question. Additionally, the Application noted that filing of the Application

---

[28] This includes obtaining an understanding of the client's financial condition, preparing and filing the bankruptcy schedules (including schedule F), preparing and filing the statement of financial affairs, preparing and filing the other forms required by § 521 of the Bankruptcy Code, attending the § 341 meeting of creditors, and assuring the debtor receives his or her discharge.

had not been approved by the Debtors.[29]  The Application was never amended to address any of these points.  Insufficient work and effort went into preparing the Application.  The Court finds that the Debtors did not receive value from the nature or extent of the services rendered in this project category.

Second, the Court is left to ask why this fee application was filed in the first place.  The time expended by both the Court and the Firm are totally disproportionate to any result that the Firm could possibly have hoped to achieve in this case.  Given the Court's findings, the Firm would have been better off had it proceeded under the Court's Standing Order.  Clearly no value was received by anyone in proceeding at variance to the Court's Standing Order as the Firm chose to do in this case.  Without regard to any of the other considerations that the Court has raised herein concerning the Firm's billing practices, the Court finds that filing the Application in this case was unreasonable.  It will award no fees for its preparation.

In summary, the Court finds the following fees requested by the Firm in its fee Application to be reasonable:

|  |  |
|---|---|
| Category one | $1,961.50 |
| Category two | $  150.00 |
| Category three | $  150.00 |
| Category four | $  500.00 |
| Category five | $  150.00 |
| Category six | $      0.00 |
|  | $2,911.50 |

As the Court has already approved under the provisions of the Standing Order an award of fees in the amount of $3,700, which award exceeds the amount the Court has found reasonable under the terms of the Application, the Court will not approve the Firm's request for an additional award of compensation in the amount of $2,569 in this case.

---

[29]  The Court is at a loss as to how the Firm can file an Application for approval of compensation that its own client has not first approved.

**Conclusion**

The Firm complains in its Post Trial Memorandum that it is being singled out from other firms.[30]  All attorneys deserve to be compensated fairly for the reasonable and necessary services they provide for their clients.  Courts should not distinguish in this regard between services provided by consumer lawyers and those provided by commercial lawyers.  All clients deserve the service of capable counsel.  But that end is advanced through a more uniform recognition of the reasonableness of the lawyers' hourly rates, not through an artificial manipulation of the number of hours devoted to the case.  The Court routinely reviews fee applications in the context of both Chapter 7 and Chapter 11 cases.  The Court has not observed the same deficiencies in those applications as it has here.

The Firm also complains in its Post Trial Memorandum that it is being sanctioned for bringing forward fee applications under the Court's alternative procedures.  Nothing could be further from the case.[31]  However, when attorneys choose to apply for a fee at variance with the policy statements set forth in the Court's Standing Order, they are subject to the same high standards as professionals are held under other chapters of the Bankruptcy Code.  The Court's adoption of a relaxed standard under its Standing Order for the award of attorneys fees in routine Chapter 13 cases does not mean that the Court will condone or tolerate applications made under

---

[30]  On page 7 of its Post Trial Memorandum, the Firm suggests that the Office of the U.S. Trustee, in expressing its concern over the "rounding up" billing procedure of the Firm, "is disingenuously advocating the development of a special standard made applicable only to Boleman's applications."

[31]   The Court has previously approved applications for supplemental compensation for the Firm at substantial variance to the "no look" fee in Chapter 13 cases which involved litigation over substantive issues.  *See, e.g., In re LaVigne,* Case No. 07-30192-KRH (May 8, 2009), *In re Hunt,* Case No. 07-31402-KRH (May 8, 2009), *In re Oliver,* Case No. 07-31247-KRH (May 11, 2009), *In re Carpenter,* Case No. 06-32914-KRH (May 12, 2009).  No litigation over any issue arose in the case at bar.  *See In re Hall,* Case No. 07-32071-DOT (September 29, 2009) ("[A]n issue may be evaluated by whether litigation was necessary.").

the alternative procedures on a relaxed standard just because the applications arise under Chapter 13.

The Standing Order was adopted to forestall consideration of these types of issues in routine Chapter 13 cases.  This is nothing but a typical Chapter 13 case.  Had the menu adopted by the Standing Order been utilized in this case, the award of compensation would have been higher than that awarded under the Application.  Supplemental fee applications at variance with the Court's Standing Order were never intended to be a means for expanding the amount of the "no look" fee requested and paid at the commencement of an otherwise routine Chapter 13 case.[32]  Except in unusual cases where significant, material issues arise that require counsel to expend additional, unanticipated services, counsel should proceed under the Court's Standing Order for approval of their fees.

If the need arises in the course of a case for the rendition of services that were not reasonably anticipated when the "no-look" fee was requested and approved, then an attorney may file a formal application for additional compensation.   Interim Proc. 2016-1(C)(8).   The application must conform in all respects with the Court's standards for approval of fee applications under § 330 of the Bankruptcy Code, Rule 2016(a) of the Federal Rules of Bankruptcy Procedure, and the billing guidelines promulgated by the Office of the U.S. Trustee.  Counsel will need to present evidence as to why such services were unanticipated at the commencement of the case, why such services were necessary, and why the services fall outside the norm for routine services rendered in a Chapter 13 case.  The Court anticipates that the cases

---

[32]  Counsel receive tremendous benefit from being able to proceed under the Court's Standing Order.  The fees and cost are approved in the ordinary course without scrutiny and are paid up front from the first funds paid into the estate.  Thus, not only are counsel able to avoid the cost and uncertainty of legal proceedings to determine the reasonableness of their fees, but also they are able to insulate themselves from the risks that other creditors bear of a subsequent payment default.

26

in which such a need may arise will be confined for the most part to situations where litigation ensued over substantive issues that were not capable of consensual resolution.

The Firm has failed to meet its burden of proof to justify the award of a supplemental fee allowance in this case.  The Court has already awarded the Firm compensation in an amount that exceeds the amount found reasonable based on its Application.  Accordingly, the Court will deny the Firm's request for supplemental fees in the amount of $2,569.

A separate order shall issue.

ENTERED: _____

_____/s/ Kevin R. Huennekens_____
UNITED STATES BANKRUPTCY JUDGE